UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TARIQ MAHMOUD ALSAWAM | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1244 (CKK) |
| | ) | |
| GEORGE W. BUSH, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## PETITIONER'S REPLY IN SUPPORT OF MOTION
## FOR ORDER REQUIRING RESPONDENTS TO PROVIDE 30 DAYS' ADVANCE
## NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO

Tariq Mahmoud Alsawam ("Petitioner"), by and through undersigned counsel, respectfully submits this reply in support of his motion for an order requiring Respondents to provide advance notice of his transfer or removal from the Guantánamo Bay Naval Base ("Guantánamo"). In the absence of a court order requiring such notice, there is a substantial risk that Respondents will transfer Petitioner in the dark of night "to the control of [an]other government[] for continued detention, investigation, and/or possible prosecution," Resp. Opp. at 6, without providing Petitioner with any opportunity to contest the transfer. It is beyond appalling that Respondents claim the authority to "render" a detainee to a country of their own choosing based on their own assessment of the risks even after a determination has been made that "continued detention by the United States is not warranted," id., and here Respondents go even further: they maintain that they may effectuate such a potentially detrimental transfer *without any input from the courts or from the former detainee himself*. The fair legal process that the Supreme Court has repeatedly maintained applies to the Guantánamo detainees surely

1

extends to requiring the government to notify a detainee of his imminent removal to another jurisdiction. Respondents have not demonstrated any cognizable harm that they would suffer from the modest relief requested here, while the harm to Petitioner from being rendered into foreign custody for possible torture is obvious and palpable.

## PRELIMINARY STATEMENT

Respondents freely admit that the United States government has a policy of transferring Guantánamo detainees "to the control of another government, typically the government of his country of citizenship, for release" *or* "for continued detention, investigation, and/or possible prosecution" in accordance with that foreign jurisdiction's "law enforcement, prosecution, or other interest." Resp. Opp. at 6 (citation omitted). Although the Respondents claim that the United States does not "render" detainees from the frying pan of their illegal detention at Guantánamo into the fire of a foreign torture den, a careful reading of the government's transfer "policy" reveals that a detainee may be handed over to *any* foreign government *anywhere* so long as the United States government believes that the chances that the individual will be tortured in that foreign state are no greater than 50%. *Id.* at 7-8. Odds are, then, at least some of the former detainees will be subjected to inhumane mistreatment in the foreign jurisdictions that the United States government selects for them. *See, e.g.*, Pet. Mot. at 2-4 (discussing news reports). Consequently, it is mind-boggling that Respondents would resist providing *any* Guantánamo detainee with advance notice of where and when the United States plans to send him. More startling still is the Respondents' contention that neither the detainee himself nor the courts should have anything to do with this matter at all.

2

It is, of course, common for courts to determine whether refugees under the government's control should be transferred to the control of foreign governments. *See, e.g., Lindstrom v. Graber*, 203 F.3d 470, 474-76 (7th Cir. 2000) (All Writs Act permits court to stay extradition pending appeal of habeas corpus petition); *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (All Writs Act permits federal Courts of Appeals to stay deportation orders pending appeal of habeas corpus petition). The case for judicial review of Respondents' proposed transfer of Petitioner is even stronger: unlike the typical person challenging extradition or requesting withholding of removal, Petitioner finds himself under the control of the United States not by choice, but as the result of being abducted and imprisoned by the United States government based solely upon its belief that he is an "enemy combatant" (a belief that likely will have been debunked at the point in which the government makes a determination that "continued detention by the United States is not warranted," Resp. Opp. at 6, and, therefore, transfer is appropriate). It is difficult to imagine a more perverse rule of law than that proposed by Respondents here, which would provide the very party who abducted and wrongfully imprisoned Petitioner with the sole and unreviewable discretion to determine whether the risks of torture or persecution associated with his transfer or repatriation are acceptable.

In the instant motion, Petitioner requests merely that he be provided with 30 days' advance notice of any intended removal from Guantánamo. After all, Petitioner is not—as Respondents would have it—an object to be discarded when and how they see fit, but a *person* who, at the very least, should be permitted the opportunity to contest the legality of a transfer that might put him in harm's way. There is no basis in law or logic to deny Petitioner's simple request, which could in no way harm Respondents. Whereas Petitioner would be hurt beyond

3

measure if he is denied the chance to challenge his transfer and ends up being tortured, a notice order would not cause Respondents to suffer any cognizable harm at all: if the specific transfer proposed by Respondents is deemed lawful by the Court during any subsequent challenge, it will not be enjoined; if, on the other hand, the Court concludes that the proposed transfer would unjustifiably endanger Petitioner's health or well-being then it could be enjoined *before* Petitioner suffers irreparable harm.   Indeed, for these very reasons, in related matters this Court has ordered that the government provide advance notice of any intended removal of Guantánamo detainees.  *See, e.g., Abdah v. Bush*, No. Civ. A. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005); *Al-Joudi v. Bush*, No. Civ. A. 05-301 (GK), 2005 WL 774847 (D.D.C. Apr. 4, 2005).

As evidenced by these prior decisions, this Court clearly understands that torture, once inflicted, cannot be undone; the Court's ability to enforce its orders, if lost, may be impossible to regain. Petitioner's requested relief is necessary to ensure that Petitioner is afforded an opportunity to challenge the legality of a transfer that may cause him further unnecessary and unwarranted harm, and it does nothing more than preserve this Court's jurisdiction and ability to enforce its orders.  Respondents are simply wrong in claiming that this Court must stand aside, or even assist, while Respondents transfer illegally-held prisoners into the custody of a torture-practicing foreign state, in violation of the United States' obligations under international and domestic law.  Accordingly, Petitioner's motion should be granted.

4

## ARGUMENT

**I.     THE JURISDICTION-STRIPPING PROVISIONS OF THE DETAINEE TREATMENT ACT DO NOT APPLY.**

Respondents argue that this Court has no jurisdiction to consider Petitioner's habeas claims, or any motions related to such claims, because the Detainee Treatment Act ("DTA") "vests exclusive jurisdiction over this action in the Court of Appeals." Resp. Opp. at 1. This argument flies in the face of the Supreme Court's recent determination in *Hamdan v. Rumsfeld*, ___U.S. __ (2006), 2006 WL 1764793, in which the Court considered—*and rejected*—substantially the same jurisdictional arguments that Respondents make here. For example, the Supreme Court squarely held "that §1005(e)(1) does not strip federal courts' jurisdiction over cases pending on the date of the DTA's enactment." *Id.* at *16 n.15. Contrary to Respondents' suggestion otherwise, then, *see* Resp. Opp. at 1-2, section 1005(e)(1) has no relevance to this case.

The government is also wrong in its analysis that section 1005(e)(2)—the only other jurisdiction-stripping provision relied upon by the Respondents, *see* Resp. Opp. at 1-2—has any bearing here. Section 1005(e)(2) grants the D.C. Circuit "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal ["CSRT"] that an alien is properly detained as an enemy combatant." As the Supreme Court recognized, because "subsections (e)(2) and (e)(3) grant jurisdiction only over actions 'to determine the validity of any final decision' of a CSRT or commission,"a petitioner who is "not contesting any 'final decision' of a CSRT or military commission . . . does not fall within the scope of subsection (e)(2) or (e)(3)." *Hamdan*, 2006 WL 1764793 at *15. In response to the argument that

5

Congress could not have intended the "exclusive review" mechanism to be so limited, the

Supreme Court noted:

> There is nothing absurd about a scheme under which pending habeas
> actions—particularly those, like this one, that challenge the very legitimacy of the
> tribunals whose judgments Congress would like to have reviewed—are preserved, and
> more routine challenges to final decisions rendered by those tribunals are carefully
> channeled to a particular court and through a particular lens of review.

*Id.* at *16.

The broad language of Section 1005(e)(1) further demonstrates that Section 1005(e)(2)

applies solely in those limited cases in which a prisoner opposes only the validity of his CSRT.

Section 1005(e)(1)—which, as noted above, does not apply to pending habeas cases—provides

that "no court, justice or judge shall have jurisdiction to hear or consider . . . an application for a

writ of habeas corpus."   If the government was correct that Section 1005(e)(2) channels all

detainee claims into the Court of Appeals, Section 1005(e)(1) clearly would be rendered

superfluous, in violation of well-established principles of statutory construction.  *Asiana Airlines*

*v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of interpretation requires us

to construe a statute so that no provision is rendered inoperative or superfluous, void or

insignificant.") (internal quotation marks and citations omitted).

Even a brief review of Petitioner's habeas petition reveals clearly that his claims

transcend the CSRT's particular 'combatant status' determination because, under the theory

advanced therein, that tribunal itself is a legal irrelevancy, created unlawfully and carried out in

violation of operative law.  In the language of *Hamdan*, Petitioner "challenge[s] the very

legitimacy" of the CSRTs and ultimately seeks relief far beyond mere declaratory relief in the

form of an order stating that the CSRT's enemy combatant decision is erroneous.   Among the

6

numerous allegations that Petitioner makes in the habeas petition is the claim that the

Executive's conduct and policies exceed the bounds of Article II of the Constitution, and, in

addition to declaratory and injunctive relief, petitioner seeks *habeas corpus*—the remedy that

permits him to demand either release to freedom or legal justification for imprisonment.[1]

Consequently, Respondents' attempt to recast Petitioner's habeas action as nothing more than a

challenge to his "designation as an enemy combatant," Resp. Opp. at 2—and therefore subject to

the jurisdiction-stripping provision of Section 1005(e)(2)—is misguided and must fail.

 In any event, the plain language of the jurisdiction-stripping provisions of Section 1005

relied upon by the Government demonstrates that those provisions apply, if at all, only to claims

concerning the detention of detainees "at Guantanamo." *See* DTA § 1005(e)(1) (applying to

"application[s] for a writ of habeas corpus filed by or no behalf of an alien detained by the

Department of Defense *at Guantanamo Bay, Cuba*") (emphasis added); DTA § 1005(e)(2)

---

[1]Specifically, Petitioner's habeas action (dkt no. 9) alleges, among other things, that: (1) Petitioner is not properly detained subject to President Bush's authority as Commander-in-Chief, under the laws and usages of war, or Joint Resolution 23, Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) ("AUMF"); (2) the executive order issued by President Bush, 66 Fed. Reg. 57,833 § 2 (Nov. 13, 2001), was not authorized by Congress and is beyond the scope of the Joint Resolution; (3) Petitioner has been denied the process due to him under common law and the Due Process Clause of the Fifth Amendment, domestic civil and military law, and international law; (4) the conditions of confinement at Guantánamo are in violation of the Constitution, the regulations of the United States Military, the Geneva Convention, the International Convention on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the 1954 Convention Relating to the Status of Refugees and customary international law; (5) Petitioner is at risk of being rendered without lawful procedures to a country that engages in torture during interrogations and incarceration; and (6) that he is entitled to relief under the Fifth Amendment, the Third and Fourth Geneva Conventions, customary international humanitarian and human rights law, the Alien Tort Statute, Article II of the Constitution, the Administrative Procedure Act, the Convention Against Torture, the 1954 Convention Relating to the Status of Refugees, 28 U.S.C. §§ 2241 and 2242, and the Declaratory Judgment Act.

(applying to actions relating to "detention by Department of Defense of an alien *at Guantanamo Bay, Cuba*") (emphasis added).  The instant motion does not address the Petitioners' continued "detention *at Guantanamo Bay, Cuba,*" however; instead, it concerns the process by which Petitioner will ultimately be *transferred from* Guantánamo, to ensure that such transfer will not result in continued unlawful detention or torture.  The requested notice order thus necessarily falls outside the geographical scope of Sections 1005(e)(1) and (e)(2).

This reading is supported further by Section 1003, which provides that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment," DTA § 1003(a), and that "[n]othing in th[at] section shall be construed to impose any geographic limitation on the applicability of the prohibition against cruel, inhuman, or degrading treatment or punishment under this section," DTA § 1003(b), which is defined under Section 1003(d) as "[c]ruel, inhuman, or degrading treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations . . . to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment."  Section 1003 thus codifies the right of all prisoners in the custody of U.S. forces not to be "subjected" to such treatment, whether imprisoned at Guantánamo, in transit therefrom, or at any other physical location.  *Cf.* DTA §§ 1005(e)(1), 1005(e)(2) (limiting application to "detention . . . at Guantanamo Bay, Cuba").  And because Section 1003(c) provides that "this section shall not be superseded, except by a provision of law enacted *after* the date of the enactment of this Act which specifically repeals, modifies, or supersedes the provisions of this section" (emphasis added), the

8

jurisdiction-stripping provisions of Section 1005 of the same act, which were enacted at the same

time, cannot limit in any way Petitioner's right under Section 1003 to challenge his unlawful

transfer to foreign authorities for the purpose of continued detention or torture.

## II. ALL FOUR BALANCING FACTORS WEIGH IN PETITIONER'S FAVOR, ESPECIALLY IN LIGHT OF THE LIMITED INJUNCTIVE RELIEF HE SEEKS; THUS, THIS COURT SHOULD ORDER NOTICE UNDER FED. R. CIV. P. 65.

Respondents selectively quote judicial opinions for the proposition that preliminary

injunctions are "extraordinary" and "drastic," Resp. Opp. at 10, but they fail to acknowledge the

extraordinary facts of this entire situation.  In an *ordinary* case, a plaintiff is not held

incommunicado by the respondent, is not wholly at the respondent's mercy, and is not at risk of

being shipped off to a foreign torture den outside of the Court's jurisdiction.  In an *ordinary* case,

the plaintiff has the opportunity to present his own testimony, and the respondent does not have

the power to unilaterally deprive the plaintiff of that right.  In an *ordinary* case involving a

request for habeas relief, there have typically been extensive prior legal proceedings subject to

full judicial review, and no discovery may therefore be necessary.  None of these "ordinary" facts

exist here.

Respondents also overstate the law concerning injunctive relief generally, stating that

> [t]o prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).

Resp. Opp. at 10.  But the rule in this Circuit is not so strict.  Indeed, it is well established that

the four factors "'interrelate on a sliding scale' and must be considered in relation to one another,

9

for 'if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Abdah*, 2005 WL 711814, at *3 (quoting *Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1317-18 (D.C.Cir.1998)).  That is to say, where the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953)).  In other words, "[a]n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant.  There is substantial equity, and need for judicial protection, whether or not the movant has shown a mathematical probability of success." *Washington Metro.,* 559 F.2d at 844.

        In the instant case, each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested, and unquestionably narrow, injunctive relief:  (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner is likely to succeed on the merits of his claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture.  *See Abdah*, 2005 WL 711814, at *3 (citing *Serono Labs.*, 158 F.3d at 1317-18); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).

A.    **It Cannot Reasonably be Disputed That Petitioner May Suffer Irreparable Harm.**

Respondents' practice of rendering detainees to foreign governments without notice or an opportunity to be heard poses two obvious and substantial threats to Petitioner:

1.    *There Is A Serious And Substantial Risk That Petitioner Will Be Tortured.*

First and foremost, Petitioner faces the possibility of a "transfer to a country where [he] may be tortured or indefinitely confined, which undeniably would constitute irreparable harm." *Al-Joudi*, 2005 WL 774847, at *4; *id.* (noting that the government has in some instances "transferred [detainees] to countries that our own State Department has acknowledged torture prisoners, including Pakistan, Saudi Arabia and Morocco"); Pet. Mot. at 2-4. Here, Petitioner, who is a Bosnian citizen of Egyptian descent, may be faced with the additional risk of mistreatment or incarceration if he is returned to his country of origin. *See* Exhibit A–Affidavit of Geoffrey Mock, Egypt Country Specialist for Amnesty International (noting risk of torture upon transfer to Egypt, methods of torture favored by Egypt's security forces and U.S. collusion in seizing and transferring individuals to Egypt for torture, and concluding that detainees returned to Egypt are likely to face torture and imprisonment without legal protection); *see also* Order in *Alladeen v. Bush*, No. 05-833, attached hereto as Exhibit B (enjoining respondents from removing the former detainee from Guantánamo and repatriating him to Egypt based on the Court's finding "that there is an immediate threat of irreparable injury and that injunctive relief is necessary to preserve the status quo").

Respondents attempt to mitigate these concerns by submitting two declarations of government officials concerning the United States' general policies concerning the transfer of

11

Guantánamo detainees to foreign countries.  *See* Resp. Opp. at 7  (asserting that generalized declarations of Pierre-Richard Prosper and Matthew C. Waxman make clear that "[i]t is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured").  "These declarations concerning general policy and practice, however, do not entirely refute Petitioner['s] claims or render them frivolous."  *Abdah,* 2005 WL 711814, at * 4; *see also Al-Joudi*, 2005 WL 774847, at *4 ("While the Government presents declarations that attempt to mitigate these concerns, they neither refute Petitioners' claims nor render them frivolous.").   Nor is it incumbent upon petitioner at this point in time to "explain how they could possibly obtain any evidence in the 30-day window they would have before a transfer," *Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 197-98 (D.D.C. 2005), because absent the relief Petitioner seeks here, he has no way of knowing where Respondents may send him, and therefore no ability to investigate the legality of that transfer.

Respondents recognize, as they must, that the foreign country to which a former detainee is transferred "may have law enforcement, prosecution, or other interest in the detainee," and that "the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it."  Id. at 6, 16 n.10.   But it is *precisely because* the courts of the United States have no control over the situation *after* the transfer that it is critical that the initial determination be made with the utmost care so that the country chosen for Petitioner's repatriation or transfer will not be one in which he finds himself subjected to further interrogation, torture or indefinite imprisonment. *See Abdah,* 2005 WL 711814, at * 4; *Al-Joudi*, 2005 WL 774847, at *4.

Regardless, it is clear that the substantial threat of subsequent torture is more than sufficient to justify the limited relief requested. As the Court noted in *Kurnaz v. Bush*, No. Civ. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) "[w]hile the Court has no occasion to decide at this time whether this or any other type of transfer could be subject to an injunction, several examples offered by petitioners raise sufficiently serious concerns to justify the limited remedy of advance notice":

> For instance, a petitioner could be transferred to the custody of a different United States custodian in a foreign country, such as the United States military base in Afghanistan. Alternatively, he could be transferred to the custody of a foreign government, but held under the direction and control of the United States government. Or, he could be transferred to the custody of a country where he has never had occasion to violate that country's laws, again raising a possible question as to the governmental claim of an 'independent law enforcement' interest.

Id. at *2 (internal citations omitted). These same concerns justify entry of an order requiring advance notice of transfer here.

### 2. *Petitioner faces the threat of irreparable harm based on the potential elimination of this Court's jurisdiction over this case.*

As this Court has recognized, transfer of Petitioner to another country, could "effectively extinguish [Petitioner's] habeas claims by fiat. Such transfer[] would eliminate any opportunity for Petitioner[] to ever obtain a fair adjudication of [his] 'fundamental right to test the legitimacy of [his] executive detention.'" *Abdah*, 2005 WL 711814, at *4 (quoting *Lee v. Reno*, 15 F. Supp. 2d 26, 32 (D.D.C. 1998)). It follows therefore that, absent the relief sought by the instant motion, Petitioner's ability to challenge the legality of the transfer itself may also be eliminated. Respondents "may not act to deprive this court of its jurisdiction over the very 'corpus' of this case; indeed, the 'federal courts may and should take such action as will defeat attempts to

13

wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.'" *Abdah*, 2005 WL 711814, at *4 (quoting *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004)).

In response, Respondents argue that providing Petitioner with an opportunity to challenge the legality of any proposed transfer would be futile because "No Valid Legal Basis Exists for a Judicial Order Enjoining Transfer or Repatriation of an Individual Previously Detained by the United States as an Enemy Combatant." Resp. Opp. at 15. As this Court explained in *Abdah*, "Respondents are correct that if there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted." 2005 WL 711814, at *4 (emphasis in original). However, the Court concluded that "Respondents are wrong . . . in arguing that there are in fact no such circumstances present[] and that [,] consequently[,] there is no legal basis for judicial involvement in transfer or repatriation decisions regarding Petitioners." *Id.* at *4.

Respondents concede that "release" involves in the first instance, transfer to the control of a foreign government. *See* Resp. Opp. at 6. The same potential harm of which petitioners in *Abdah* complained will thus remain here unless and until Respondents agree, or are otherwise ordered, to disclose the identity of the country to which they intend to transfer Petitioner. It is axiomatic that the "release" of an individual, consequent to the grant of habeas relief or otherwise, may not be engineered to cause him harm. It would be no more appropriate for the warden of a prison to "release" a man by pushing him off a cliff, than it would be to permit the government to "release" Petitioner by transferring him to a foreign government for further unwarranted interrogation, torture or indefinite detention without judicial process. Inherent

14

within the Court's jurisdiction to entertain Petitioner's habeas claim is a duty to ensure that his

"release" is not simply an exercise of transferring him from one prison cell to another. *See id.* at

*4, n.3 ("[I]t seems beyond question that advocating for release into freedom is not equivalent to

advocating for transfer from ongoing detention in one locale to ongoing detention in another.");

*see also Lindstrom*, 203 F.3d at 474 ("The object of the habeas corpus proceeding, a proceeding

directed against the warden of the American jail in which [petitioner] is being held . . . was . . . to

*prevent [petitioner] from being sent back to Norway*") (emphasis added).

    In arguing that separation of powers principles bar "judicial involvement in transfer or

repatriation decisions with respect to enemy combatants held abroad, or . . . an advance notice

requirement to support and facilitate such involvement," Resp. Opp. at 17, Respondents place

significant emphasis on the "analogous context of extradition." Id. at 19.  Specifically,

Respondents point to the Rule of Non-Inquiry, pursuant to which courts have, under certain

circumstances, refrained from examining the fairness of a requesting nation's laws or the

treatment that awaits the fugitive.  See Resp. Opp. at 19-21 (citing, *inter alia, United States v.

Kin-Hong*, 110 F.3d 103 (1st Cir. 1997); *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990);

*Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980); *Peroff v. Hylton*, 563 F.2d 1099,

1102 (4th Cir. 1977); *Hoxha v. Levi*, 371 F. Supp. 2d 651, 659-61 (E.D. Pa. 2005) on appeal, No.

05-3149 (3d. Cir.); *Matter of Extradition of Sandhu*, 886 F. Supp. 318, 321 (S.D.N.Y. 1993)).

Thus, Respondents assert that Petitioner should not be permitted in this case to "turn to the courts

to second-guess Executive judgments about matters such as custodial conditions and/or the

adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a

foreign government's assurances."  Resp. Opp. at 21 (citation omitted).

15

Respondents' reliance on the extradition analogue is misplaced.  Petitioner is *not* a fugitive fleeing from criminal proceedings here or elsewhere.  Nor have there been any allegations whatsoever that criminal charges are pending against him in any other jurisdiction.  In fact, far from being a fugitive who entered the United States on his own volition attempting to avoid criminal proceedings afar, Petitioner was abducted by the United States government, which transported him into its own jurisdiction and now seeks to send him to a country of its choosing.

In any event, courts *do* have jurisdiction to consider habeas corpus petitioners challenging extradition orders.  *See Ward v. Rutherford*, 921 F.2d 286 (D.C. Cir. 1990) ("actions taken by magistrates in international extradition matters are subject to habeas corpus review by an Article III district judge, with appellate review available thereafter."); *see also DeSilva v. DiLeonardi*, 181 F.3d 865, 870 (7th Cir. 1999) ("person resisting extradition must seek a writ of habeas corpus under 28 U.S.C. § 2241"); *In re Extradition of Drayer*, 190 F.3d 410, 412, n.2 (6th Cir. 1999) ("[t]he district court properly noted the appropriate habeas remedy was pursuant to 28 U.S.C. § 2241….") *cert. denied*, 528 U.S. 1176 (2000); *Matter of Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) ("putative extraditee customarily can challenge an order for extradition only by collateral attack, typically through habeas corpus").  Specifically, habeas corpus review extends to "whether the magistrate had jurisdiction, whether the offense charged is within the [extradition] treaty, and by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (citations omitted).  Indeed, many of the cases upon which Respondents rely note the availability of such habeas corpus review.  *See, e.g., United States v. Kin-Hong*, 110 F.3d 103, 117 (1st Cir. 1997) ("[t]he existence of 'any evidence

16

warranting the finding that there was reasonable ground to believe the accused guilty' was one of

only three issues that the *Fernandez* court said might permissibly be reached on habeas.");

*Ahmad v. Wigen*, 910 F.2d 1063, 1064 (2d Cir. 1990) ("on an appeal from the denial of habeas

corpus in an extradition proceeding, we are concerned only with whether the appellant's alleged

offense fell within the terms of an extradition treaty, and whether an official with jurisdiction was

presented with sufficient evidence to warrant a finding that there was a reasonable ground to

believe that the appellant was guilty"); *Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir.

1980) (quoting the scope of review described in *Fernandez*).  Thus, even under the extradition

analogue put forth by Respondents, Petitioner would be entitled to the relief he seeks here:  an

opportunity to challenge the legality of the government's proposed transfer of him to the control

of a foreign government.

    Finally, it is important to note that the need for this Court to grant the relief Petitioner

requests is especially pressing due to the increasing number of accounts in which Respondents

have engaged in extraordinary rendition.  According to several news reports, including several

cited in Petitioner's motion and Petition for Habeas Corpus, the United States has secretly

removed detainees and others suspected of terrorist crimes to other countries for interrogation or

detention without complying with extradition or other legal process.  This practice, known as

"rendition," "irregular rendition," or "extraordinary rendition," is understood to be used to

facilitate interrogation by subjecting detainees to torture, and Respondents have also engaged in

rendition to avoid judicial orders and judgments.  For example, after another judge of this Court

found that the allegations of Omar Abu Ali—an American citizen claiming that he was being

detained and tortured in Saudi Arabia at the direction of the United States—were sufficiently

credible to warrant jurisdictional discovery, *see Ali v. Ashcroft*, No. 04-1258 (JDB), 2004 U.S.

Dist. LEXIS 25239, at *122, (D.D.C., filed Dec. 16, 2004), the United States acted to moot Ali's

habeas case by returning him to the United States to face criminal proceedings. *See* Daniel

Eisenberg, *The Rough Justice of War*, Time Magazine, Mar. 7, 2005.

Respondents' documented practice of transferring suspects outside of the jurisdiction of

the United States substantiates Petitioner's fears of being deprived of United States judicial

protection. Moreover, whether Petitioner is subject to a transfer tomorrow, or next week, or the

week after that, such facts are exclusively within the control of the Respondents. Clearly,

Petitioner has presented a sufficiently severe and substantial risk of harm to justify the limited

injunctive relief requested here.

### B.    The Requested Notice Would Cause No Cognizable Harm To Respondents.

In stark contrast to the actual bodily harm and loss of opportunity for legal redress that

Petitioner faces, Respondents can articulate no actual harm that they will suffer if required to

provide advance notice of Petitioner's removal:

> The Court fails to see any injury whatsoever that the Government would suffer from
> granting the requested preliminary injunction. Petitioners request only 30 days' notice of
> transfer – a narrow and discrete request that would impose no burden on the Government.
> Beyond 'vague premonitions' that such relief would harm the executive's ability to
> conduct foreign policy, there is no concrete evidence that such notice actually will intrude
> upon executive authority. For example, granting Petitioners' request for 30 days' notice
> of transfer would not require the Court to second-guess foreign policy decisions of the
> Executive, would not require the Government to divulge information relating to its
> negotiations with foreign governments, and would not prevent the Government from
> speaking with one voice.

*Al-Joudi*, 2005 WL 774847, at *5; *see also Abdah*, 2005 WL 711814, at *5 (Beyond…vague premonitions…the court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their clients will intrude upon executive authority.").

Nor would an order requiring advance notice "[t]rample on the [s]eparation of [p]owers." Resp. Opp. at 22.  The requested injunction does not prevent or prohibit the Respondents from obtaining "assurances" from a foreign government (although, given the human rights accounts, such "assurances" appear to be of limited value in any event).  And there is no legitimate fear of "disclosure" of confidential communications with a foreign government.  Respondents have not, and presumably cannot, identify any manner in which sensitive negotiations would be affected if they were disclosed only to the Court and counsel in this case, in the context of sealed communications reviewable only in the secure facilities that have already been established. Indeed, the requested notice would have no discernable affect on foreign relations or international negotiations; rather, it would simply encourage Respondents to consult Petitioner and his counsel during the process of locating a suitable country for transfer.  Such consultation would effectively render advance notice moot because, obviously, Petitioner would not challenge any transfer which he himself has pre-approved.

### C.     Petitioner Has Raised Serious Questions Going To The Merits, And His Claims Should Not be Terminated By Respondents' Unilateral Actions.

"To justify granting a preliminary injunction, Petitioner[] need not show 'a mathematical probability of success.'"  <u>Al-Joudi</u>, 2005 WL 774847, at *5 (quoting *Washington Metro*, 559 F.2d at 844).  Rather, in cases such as this, where the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the

19

merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro.,* 559 F.2d at 844.

Petitioner has properly invoked the jurisdiction of this Court. *See Rasul v. Bush,* 124 S. Ct. 2686, 2698 (2004). Judge Green of this Court, in her January 31, 2005 Order in the consolidated Guantanamo Cases, followed the Supreme Court's direction and rejected many of the same arguments made by Respondents here. *See* Civil Action No. 02-0299 and consolidated cases (D.D.C., filed Jan. 31, 2005). In particular, Judge Green found that the Guantanamo detainees in eleven consolidated cases stated viable claims under the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Third Geneva Convention.

Respondents argue that the Petitioner has not established that he is likely to be successful in obtaining an order "preventing *termination* of detention by the United States" by means of transfer or repatriation. Resp. Opp. at 14 (emphasis in original). This argument, however, misses the point. As noted above, the Supreme Court in *Rasul* confirmed this Court's jurisdiction, and Judge Green in the consolidated Guantanamo Cases ruled that valid claims exist. The issue, then, is not simply whether Petitioners might be successful in a separate action alleging independent grounds to block the Government's planned transfers if they were otherwise not in Court. Instead, the salient question is whether this Court, having already accepted jurisdiction over a live controversy, may act to preserve its jurisdiction already properly exercised. The answer to that question is clearly yes. It is, in fact, beyond dispute that so long as Petitioner remains under the government's control, this Court maintains jurisdiction to hear Petitioner's claims concerning that control, including any intended transfer. *See Rasul*, 124 S.Ct.

20

at 2695 ("[T]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.").

It is also important to note here that it is not even clear that this motion will ever prevent any transfers the Government wishes to effect. Indeed, Petitioner may never even *try* to prevent any future transfers. All that is sought here is the modest relief of 30 days' advance notice of the Government's intent to transfer Petitioner. If that motion is granted and the Government provides such notice, Petitioner may well decide not to challenge the Government's proposed transfer. Alternatively, if the motion is granted, the Government may decide not to render Petitioner into another country's detention. Thus, the Respondents' dire warnings of judicial interference in foreign policy decisions of the Executive Branch, and separation of powers concerns, surely must ring hollow—they are premature, if not irrelevant, at this stage.

In sum, this Court should recognize Respondents' refusal to provide advance notice for what it clearly is: a blatant effort to remove any possible legal redress that Petitioner may have concerning the merits of their decision to forcibly transfer him to the control of a foreign government. Respondents should not be permitted to avoid judicial review by refusing to disclose the very circumstances under which Petitioner's transfer or repatriation will occur. *See Abdah*, 2005 WL 711814 at *4 ("[F]ederal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.") (quotations omitted). In light of this Court's ruling in *Abdah* that "Petitioners' transfer to another nation would assuredly deprive the court of its jurisdiction," Petitioner here has demonstrated "a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the court." Id. at *5.

**D.    There Is A Clear Public Interest In Preventing The United States Government From Secretly Rendering Individuals To Foreign Countries For Detention And Torture.**

Respondents assert that they, and only they, can determine whether or when a Guantánamo detainee should be transferred to a foreign country, and that they will do so unless they, in their alleged sole and unreviewable discretion, find it "more likely than not" that the transferee "will" be tortured.  Resp. Opp., Waxman Decl. at ¶ 6 ;  Prosper Decl. at ¶ 4.  In other words, Respondents claim that this Court can do nothing to prevent the loss of its jurisdiction or the violation of applicable law, so long as the Secretary of the Navy, apparently, can convince himself that there is only a 50% chance that a detainee "will" (not may)  be tortured.

Such claims of unfettered discretion have been repeatedly rejected by the federal courts in recent cases, including the Supreme Court's decision in *Rasul*, *supra*.  As the United States District Court for the District of South Carolina astutely observed in rejecting yet another recent argument for unfettered executive discretion, "[c]ertainly, Respondent does not intend to argue here that, just because the President states that Petitioner's detention is 'consistent with the laws of the United States …' that makes it so.  Not only is such a statement in direct contravention to the well settled separation of powers doctrine, it is simply not the law."  *Padilla v. Hanft*, Civil Action No. 2:04-2221-26-AJ, Opinion and Order at 18 (D.S.C.,  Feb. 28, 2005).  Regardless of how satisfied the Executive Branch may feel about its own decisions, when a federal litigant is properly before a Court that has exercised jurisdiction over the underlying claims in a case, that litigant must be provided a meaningful opportunity to contest a transfer seeking to place him outside the Court's jurisdiction or into the hands of torturers.

22

Consequently, public policy clearly favors requiring Respondents to provide advance notice of any intended removal, so that the Court and Petitioner are afforded an opportunity to address any proposed transfers that may unnecessarily endanger Petitioner. "This factor tilts in Petitioner['s] favor, because the public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Abdah*, 2005 WL 711814, at *6 (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

## III. PETITIONER IS ENTITLED TO ADVANCE NOTICE OF HIS TRANSFER OR REMOVAL UNDER THE ALL WRITS ACT.

The All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction," *SEC v. Vision Commc'ns, Inc.,* 74 F.3d 287, 291 (D.C. Cir. 1996), *see Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784, n.2 (D.C. Cir. 1973). A court may grant a writ under the Act whenever it determines such action necessary "to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942). Should the court find adequate "alternative remedies" unavailable, *Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999), or "the traditional requirements of an injunction" inapplicable, *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1101 n. 13 (11th Cir. 2004), it may employ the Act to order the relief Petitioner seeks.

Under *Rasul*, this Court has the jurisdiction to determine the legality of Petitioner's detention and, "[a]ccordingly, the Court must also have authority to preserve this jurisdiction if it can be shown that respondents are acting to circumvent it." *Kurnaz*, 2005 WL 839542, at *2 (citing All Writs Act, 28 U.S.C. § 1651(a)); *Al-Marri v. Bush*, No. 04-2035, slip. op. at 10 n. 11

(D.D.C. Apr. 4, 2005) (quoting *SEC v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996)

(All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction")); *Abu*

*Ali*, 350 F. Supp. 2d at 54 (federal courts "may and should take such action as will defeat

attempts to wrongfully deprive parties" of their right to sue in federal court) (internal citation

omitted); *Lindstrom v. Graber*, 203 F.3d 470, 474-76 (7th Cir. 2000) (All Writs Act permits

court to stay extradition pending appeal of habeas corpus petition); *Michael v. INS*, 48 F.3d 657,

664 (2d Cir. 1995) (All Writs Act permits federal Court of Appeals to stay a deportation order

pending review of its legality).

As noted above, there are several types of transfer that raise sufficient concerns to justify

the limited remedy of advance notice, including the possibility that Petitioner "could be

transferred to the custody of a different United States custodian in a foreign country, . . . to the

custody of a foreign government, but held under the direction and control of the United States

government. . . , [o]r . . . to the custody of a country where he has never had occasion to violate

that country's laws." *Kurnaz*, 2005 WL 839542, at *2.  Closer scrutiny of Respondents' intended

transfer of Petitioner is therefore "appropriate in order to preserve the petitioner's right to obtain

review of the legality of his detention," as well as the transfer itself. *Id.*

**CONCLUSION**

For the foregoing reasons, as well as the reasons set forth in Petitioner's motion,

Petitioner respectfully requests that this Court order Respondents to provide Petitioner with 30

days' advance notice of any intention to remove or transfer Petitioner from Guantánamo.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

MARY MANNING PETRAS
Assistant Federal Public Defender

/s/
_____

KETANJI BROWN JACKSON
Assistant Federal Public Defender

625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.  20004
(202) 208-7500

August 2, 2006