# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHERIF el-MASHAD, et al.,

    Petitioners,

v.

GEORGE W. BUSH, et al.,

    Respondents.

Case No. 1:05CV00270

JUDGE: Hon. James Robertson

## AFFIDAVIT OF GEOFFREY MOCK

I, Geoffrey Mock, do depose and state as follows:

1. I am a citizen of the United States of America, more than 18 years of age and otherwise qualified to provide this affidavit.

2. I am the Egypt Country Specialist for Amnesty International USA (AIUSA). I have a Bachelor's Degree in Political Science from the University of North Carolina at Chapel Hill.

3. Prior to serving as the Egypt Country Specialist, I worked on AIUSA's Middle East Coordination Group beginning in 1989. I then became the Syria Country Specialist, before changing the focus of my work to Egypt. I have been the Egypt Country Specialist since 1995.

4. In my capacity as Country Specialist, I have spent nearly nine years monitoring the human rights situation in Egypt. I am responsible for gathering, examining and acting as a conduit for information concerning the status of human rights in Egypt between AIUSA, the media, official governmental contacts, and other nongovernmental organizations ("ngo's"). I have developed contacts and sources among these various entities, as well as among various Egyptian human rights activists here in

the United States.

5. Also in my role as Country Specialist, I advise staff and membership regarding the status of human rights in Egypt.

6. I monitor and respond to U.S. media coverage of human rights in Egypt. In addition, I interview victims and witnesses of human rights violations in Egypt when they are here in the U.S., and if necessary, testify, or prepare testimony for AIUSA representatives to U.S. governmental agencies or officials concerned with human rights issues in Egypt.

7. Although I have no personal knowledge of or involvement with the particular situation facing the Petitioners in the above-captioned matter, I am an expert on human rights practices in Egypt.

8. I have reviewed the Petition for Writ of Habeas Corpus and Request for Declaratory Relief, as well as Petitioner's Motion for Preliminary Injunction and the Respondents' Opposition thereto.

9. As an expert in the subject matter of human rights in Egypt, it is my opinion that, should Petitioners be returned to Egypt they are very likely to face denial of their due process rights, arbitrary detention, torture and possible death.

10. Egypt has a long record of human rights abuses, as recognized by the United States Department of State in its most recent Country Report on Egypt.

11. Although Egypt has a regular judiciary system that meets international standards of due process, impartiality and independence from the government, there is a dark side to Egyptian justice in the form of special Military and Security Courts ("Security Courts").

12. These Security Courts were established under State of Emergency laws passed in the wake of the assassination of former Egyptian President Anwar Sadat. While these courts were established to combat terrorism or security crimes, often, prisoners of conscience are referred to the custody of these Security Courts, including pro-democracy activists, human rights defenders, and individuals who Amnesty International believe have been charged because of their religious beliefs or sexual orientation.

13. These Security Courts fail to meet even the most basic international standards of due process rights. For example, the hallmark of these courts are arbitrary detentions – including imprisonment for long periods of time without charge – the lack of access to counsel or the severe limitations on counsel's ability to advocate effectively on behalf of detainees, the lack of appropriate discovery mechanisms, the use of evidence extracted under torture, and the lack of effective appeal process.

14. AIUSA and Amnesty International have documented several examples of the Security Courts' denial of basic due process rights and use of torture. Indeed, Amnesty International believes that torture is systematic in Egypt – and is practiced widely throughout the criminal justice system there.

15. In Egypt everyone taken into detention is at risk of torture. Political detainees face a heightened risk, particularly during the initial period of incommunicado detention, cut off from the outside world, at premises of the State Security Intelligence (SSI). However, victims of torture in Egypt come from all walks of life, including children, family members of suspected criminals and people accused of common crimes.

16. The most common methods which continue to be reported are electric shocks, beatings, whipping, suspension by the wrists or ankles, suspension in contorted

positions from a horizontal pole and various forms of psychological torture, including death threats and threats of rape or sexual abuse of the detainees or their female relatives. Usually victims are blindfolded to prevent them from identifying their torturers. Amnesty International has documented cases of beatings electrical shocks being applied to sensitive parts of the body, sleep deprivation, lashes, and threats of sexual assault. In addition, Amnesty International has documented numerous cases where prisoners have died in custody in circumstances which appear to have been caused by torture. While there have been a few charges brought against government agents who have engaged in torture, the vast majority of such abuse goes unreported and unprosecuted by the Egyptian government.

17. AIUSA is also aware of cases in which the U.S. government has apparently colluded in such practices. For example, Amnesty International has documented a case occurring in December 2001, in which two Egyptian asylum seekers in Sweden were reportedly detained by Swedish authorities, hooded, taken to a Stockholm airport forced to board a plane leased by the U.S. government, and flown back to Egypt. One of the men, Ahmed Hussein Agiza had been convicted by a Security Court *in abstentia* for alleged involvement with a militant Islamist group.

18. Following his forcible return, Mr. Agiza was held for more than a month in incommunicado detention in Egypt without contact with his lawyers or relatives. Amnesty International appealed to both the Egyptian and Swedish authorities on December 19, 2001, to seek assurances that Mr. Agiza would not be subjected to human rights violations if returned to Egypt.

19. In April 2001, Mr. Agiza was re-tried in an unfair procedure before a

Security Court and again convicted. Mr. Agiza was sentenced to 25 years' imprisonment. During his trial before the Security Court, Mr. Agiza reportedly stated that he had been tortured after his return to Egypt, despite assurances allegedly given to the Swedish government by the Egyptian authorities that he would not be subjected to ill-treatment.

20. The U.N. Committee Against Torture started in November 2004 investigating whether Sweden had breached international law when two Egyptian accused of terrorism charges, Muhammad al-Zari and Ahmed Agiza, were expelled to Egypt in 2001. In December 2004, the Swedish government reportedly admitted having received information that Ahmed Agiza had been tortured in Egypt.

21. Mr. Agiza's case is specifically mentioned in the U.S. Department of State's 2004 Country Report concerning Egypt, however, the State Department omits any reference to U.S. government collusion in Mr. Agiza's abduction and reported torture at the hands of Egyptian authorities.

22. Amnesty International has documented other cases of alleged torture following rendition. In February 2004, Yemeni authorities handed over 15 Egyptian nationals including Dr Sayyid 'Abd al-Aziz Imam al-Sharif, Muhammed 'Abd al-Aziz al-Gamal and Uthman al-Samman. The latter two men had been sentenced to death in absentia in Egypt in 1999 and 1994, respectively. The fate and whereabouts of those returned were not known to Amnesty International and were said not to be known to their families and friends. Their continued incommunicado detention raises concerns of torture and ill-treatment.

23. After a review of the allegations contained in the pleadings filed in the above-captioned case, and based upon my expert knowledge of human rights conditions

in Egypt, it is my opinion that, should Petitioners Sherif el-Mashad and Adel Fattouh Aly Ahmed Algazzar be returned by the U.S. government to Egypt, they are likely to face torture and imprisonment without legal protection. If petitioners are returned, therefore, their legal rights, and indeed, their physical safety, will be placed in grave jeopardy.

I declare, under penalty of perjury, that the foregoing is true and correct.



_____
Geoffrey Mock

Signed and affirmed to me this  8th  day of March, 2005 in

Durham Co.
North Carolina

_____
Notary Public   7/11/07 E.O.C.